# In the United States Court of Federal Claims

No. 12-463

Filed under seal: May 31, 2013[*]

Reissued for publication: June 4, 2013

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| \* | Bid protest; |
| \* | Conflicts Of Interest; |
| \* | Federal Acquisition Regulations |
| \* |    3.101-1 (avoiding conflicts of |
| COMMAND MANAGEMENT SERVICES, Inc.,   \* |      interest) |
| \* |    3.104-2(b)(3) (post-employment |
|     Plaintiff,   \* |      restrictions) |
| \* |    3.104-7(e)(1) ("proprietary or source |
| v.   \* |      selection sensitive information") |
| \* |    9.504(c) ("organization conflict of |
| THE UNITED STATES,   \* |      interest, unequal access"); |
| \* | Procurement Integrity Act, 41 |
|     Defendant,   \* |   U.S.C. § 423, now cited as 41 U.S.C. |
| \* |   §§ 2101-06 (prohibitions against |
| and   \* |   disclosing procurement information |
| \* |   and restrictions on employment); |
| HOTEL CONTRACTING SERVICES, Inc.,   \* | RCFC 24(a)(2) (intervention as a matter |
| \* |   of right); |
|     Defendant-Intervenor.   \* | RCFC 52.1 (Judgment on the |
| \* |   Administrative Record); |
| \* | Supplementation of the Administrative |
| \* |   Record. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Victor Aronoff Kubli**, Grayson Law Center, P.C., Germantown, Maryland, Counsel for Plaintiff.

**Austin Marshall Fulk**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.  **CPT Anthony V. Lenze**, United States Army Legal Services Agency, Contract and Fiscal Law Division, Fort Belvoir, Virginia, Counsel for the United States Army.

**James Harold Roberts, III**, Van Scoyoc Kelly & Roberts, PLLC, Washington, D.C., Counsel for Defendant-Intervenor.

---

[*] On May 31, 2013, the court filed a sealed copy of this Memorandum Opinion and Order and provided the parties the opportunity to suggest redactions from the public version any confidential and/or privileged information and to suggest any other changes or edits.  The court has corrected or clarified certain portions herein.

**MEMORANDUM OPINION AND ORDER**

**BRADEN**, *Judge*.

This case concerns a post-award bid protest regarding the United States Department of the Army's Mission and Implementation Contracting Command Center's ("MICC" or "Army") procurement of meals, lodging, and transportation services for applicants who process through the Military Entrance Processing Station ("MEPS") in Phoenix, Arizona. Before the court are pending cross-motions for Judgment On The Administrative Record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims.

## I.    RELEVANT FACTUAL BACKGROUND.[1]

### A.    The Solicitation.

On December 11, 2011, MICC issued Solicitation No. W9124D-12-R-0008 (the "Solicitation") to identify a contractor to provide meals, lodging, and transportation for applicants processing though the Phoenix MEPS, beginning July 1, 2012. AR Tab 3 at 46, 49.

The Solicitation stated that MICC would evaluate proposals based on three evaluation factors: "Mission Capability"; offeror's past performance; and "best overall value to the Government, price and other factors considered." AR Tab 3 at 55, 58. First, under "Evaluation Factor 1 – Mission Capability," MICC would consider several elements, including "sanitation/cleanliness/condition/quality control," "security/safety," "meals," "facility location," and "transportation." AR Tab 3 at 55-58. The Solicitation defined Mission Capability adjectival ratings as:

> Outstanding – Proposal (written and on-site evaluation considered) meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low.

> Good – Proposal (written and on-site evaluation considered) meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low.

> Acceptable – Proposal (written and on-site evaluation considered) meets requirements and indicates an adequate . . . understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on

---

[1] The relevant facts discussed herein were derived from: the August 9, 2012 Administrative Record ("AR 1-2629"); the July 24, 2012 Complaint ("Compl."); and depositions allowed by the court's October 23, 2012 Order and included in exhibits to Command Management Inc.'s ("Command") November 21, 2012 Motion For Judgment On The Administrative Record ("Pl. Mot. JAR Ex.").

contract performance.   Risk of unsuccessful performance is no worse than moderate.

Marginal – Proposal (written and on-site evaluation considered) does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements.   The proposal has one or more weaknesses which are not offset by strengths.   Risk of unsuccessful performance is high.

Unacceptable – Proposal (written and on-site evaluation considered) does not meet requirements and contains one or more deficiencies.   Proposal is unawardable.

AR Tab 3 at 60.

Second, under "Evaluation Factor 2 – Past Performance," MICC would consider an offeror's written descriptions of its "past performance on similar contracts it has held within the last three (3) years which are of similar scope, magnitude, or complexity to that which is contained in the solicitation." AR Tab 3 at 58.  Each offeror's past performance was to be rated: "Very Relevant"; "Relevant"; "Somewhat Relevant"; or "Not Relevant."  AR Tab 3 at 60.  In addition, the Solicitation provided for "Performance Confidence Assessment" ratings, defined as:

Substantial Confidence:   Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort.

Satisfactory Confidence:   Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort.

Limited Confidence:  Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort.

No Confidence:  Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort.

Unknown Confidence (Neutral):  No recent/relevant performance record is available of [sic] the offeror's performance record is so sparse that no meaningful confidence assessment rating can reasonably be assigned.

AR Tab 3 at 60-61.

Third, under "Evaluation Factor 3 – Price," the Solicitation provided that price would not be rated *per se*, but required offerors to "price the base and option periods" of a potential contract.   AR Tab 3 at 58-59.   In turn, MICC stated that it would evaluate the proposal that

offered "the best overall value to the Government, price and other factors," such as the Government's option to extend services, considered.  AR Tab 3 at 58.

In addition, the Solicitation provided for an on-site inspection of each offeror's proposed hotel.  AR Tab 3 at 53.  The "written proposal, in conjunction with the on-site evaluation, [would] be used to assess evaluation factor ratings."  AR Tab 3 at 59.  As part of its source selection plan, MICC would use a Source Selection Evaluation Board ("SSEB") to evaluate proposals and conduct on-site evaluations.  AR Tab 35 at 1852, 1860 (Source Selection Plan for Phoenix MEPS).  The Contracting Officer stated that MICC followed these procedures:

> Upon receipt of the technical proposals at the MEPS, each member of the [SSEB] evaluation team performed an independent evaluation of each written technical proposal using evaluation forms provided by the contracting officer, evaluating each proposal on all elements of Factor 1 Mission Capability.  SSEB members were to annotate if the offeror met the government's requirement, and further annotate any strengths, weaknesses, or deficiencies based on the offeror's written proposal.  SSEB members were not given price proposals nor informed of any pricing information prior to or during their evaluations.

AR Tab 2 at 37 (June 14, 2012 Contracting Officer's Statement).

Based on the written proposals and on-site evaluation, the SSEB would assign relevant rating definitions and descriptions: "strength"; "weakness"; "significant weakness"; or "deficiency."  AR Tab 3 at 60.  The SSEB would then report its consensus evaluations to the contracting officer, who made the final award decision.  AR Tab 35 at 1859-60.

The Solicitation provided that MICC would award a contract, without discussions, based on the "best value trade off method" (AR Tab 3 at 59), considering the following factors:

> 1. EVALUATION OF PROPOSALS.  Proposals submitted will be evaluated on Mission Capability, Past Performance, and Price factors.  Proposal shall conform to all the terms and conditions contained in the solicitation.

> 2. BEST VALUE. The Government is interested in proposals that offer value in meeting the requirements (i.e., quality performance with acceptable risk at a fair and reasonable price).

> Among technical factors: Mission Capability is significantly more important than Past Performance.  Past Performance will be separately evaluated and assessed a performance risk rating.  All evaluation factors, other than cost or price, when combined, are significantly more important than price.

> 3. PRICE EVALUATION.  Price will not be rated.  Award will be made to the responsible offeror whose proposal offers the best overall value to the Government, price and other factors considered . . . .  Where the selection official finds the proposals as being essentially equal with respect to technical factors,

price may become the determining factor in selecting the best value offer and making the award.

AR Tab 3 at 59.

## B.     The Proposals, Site Inspections, And Evaluations.

Fourteen proposals were submitted in response to the Solicitation, ten of which were evaluated.  AR Tab 2 at 34.[2]  Command submitted seven proposals on January 13, 2012 and February 9, 2012; each proposed using a different major Phoenix hotel.  Compl. ¶ 3; AR Tab 13; AR Tab 24-30 (Command's seven proposals).  Hotel Contracting Services, Inc. ("HCS") submitted a single proposal on February 1, 2012.  AR Tab 23.

The SSEB conducted on-site inspections of the proposed hotels on February 27-28, 2012 to "confirm the contents of each written proposal and to assess the cleanliness, condition, security, and overall adequacy of the facilities proposed."  AR Tab 2 at 37.  Thereafter, the SSEB reconvened from February 29, 2012 through March 2, 2012, "first completing their individual evaluation considering both findings from their written proposal and on-site evaluation of each offeror, and finally reaching a team consensus and assigning a Factor 1 Mission Capability rating to each proposal."  AR Tab 2 at 37.  These evaluations were then incorporated into a written memorandum, signed by the SSEB Chairman and presented to the contracting officer ("CO") for evaluation of "technical and price, and any tradeoffs" that would go into the Source Selection Authority's best value award decision.  AR Tab 2 at 37; AR Tab 39 at 2166-82 (SSEB Initial Report).

On March, 9, 2012, the CO issued a Source Selection Decision Document, concurring with the SSEB's findings.  AR Tab 51 at 2525-46.  Command's past performance was rated as "Very Relevant" and it received the highest rating of "Substantial Confidence."  AR Tab 15 at 198; AR Tab 16-21 (debriefings); AR Tab 51 at 2543-44.  With respect to Mission Capability, two of Command's proposals were rated as "acceptable" and the remaining five were rated as "unacceptable," based on deficiencies assessed by the SSEB.  AR Tab 5-11; AR Tab 51 at 2530-40.  The prices of Command's proposals ranged from 13.37% less to 14.59% more than HCS's proposal.  AR Tab 51 at 2528.  MICC's consensus evaluation afforded HCS's proposal the highest Mission Capability rating: "outstanding."  AR Tab 12 at 153.  HCS's past performance was rated as "Very Relevant" with "Substantial Confidence" in the Performance Confidence Assessment.  AR Tab 51 at 2528-30.  In addition, HCS's price was the second lowest of any of the prices received, and the lowest price of the proposals eligible for award.  AR Tab 51 at 2526-28.

After receiving the SSEB Chairman's evaluations, the CO determined that HCS's proposal was the "best value to the government" based on its technical ratings and evaluations and relative price.  AR Tab 51 at 2545-46 (Source Selection Decision).  The CO and the Source

---

[2] Four proposals were rejected, without being evaluated, because they were "substantially incomplete."  AR Tab 2 at 34.

Selection Authority awarded the contract to HCS on April 30, 2012.  AR Tab 54 at 2573 (Contract W9124D-12-D-0019).

    **C.**    **Mr. James Murray's And First Sergeant James Lewis's Involvement In The Procurement Process.**

From 2008 until November 2011,[3] Mr. James Murray was MEPCOM's Western Sector Command Sergeant Major and Senior Enlisted Advisor ("SEA") for all Western Sector MEPS, including the Phoenix MEPS.  AR Tab 57 at 2625; Pl. Mot. JAR Ex. 1 (Murray Dep. at 6-7 (Nov. 8, 2012)).  In this capacity, he had contact with the CO and several MEPS contractors.  Pl. Mot. JAR Ex. 1 at 11, 68-70; Pl. Mot. JAR Ex. 1 at 28, 36.  Mr. Murray also had contact with several first sergeants, including First Sergeant James E. Lewis.

During this procurement, First Sergeant Lewis was the Chairman of the SSEB.  AR Tab 35 at 1850.  In that capacity, First Sergeant Lewis, a member of the evaluation team, led the on-site inspections, and the evaluation of proposals submitted in response to the Solicitation.  AR Tab 38 at 2163.

The exact nature of the relationship between Mr. Murray and First Sergeant Lewis is the focus of Command's claims and is discussed more fully below.

**II.**    **PROCEDURAL HISTORY.**

    **A.**    **Before The Government Accountability Office.**

On May 14, 2012, Command filed a protest with the Government Accountability Office ("GAO"), challenging MICC's award of the MEPS contract to HCS.  AR Tab 32 at 1792, 1812.  Command requested a stay or termination of the MEPS contract, on the grounds that MICC's inspection findings and Mission Capability Evaluations were erroneous, unreasonable, and inconsistent with the Solicitation's evaluation criteria.  In addition, Command asserted that its proposals were not rated consistently with HCS's proposal, thereby prejudicing Command.  AR Tab 32 at 1808-10.  Because GAO determined that Command's protest was not timely, a stay was denied.  AR Tab 2 at 34 n.1.  HCS's performance of the contract began on July 1, 2012, as required by the Solicitation.  AR Tab 3 at 49.  After Command's July 24, 2012 Complaint was filed in the United States Court of Federal Claims, the GAO dismissed Command's May 14, 2012 Protest.

    **B.**    **Before The United States Court Of Federal Claims.**

On July 24, 2012, Command filed a Complaint For Injunctive And Declaratory Relief in the United States Court of Federal Claims, alleging that: (1) MICC's procurement and contract award was tainted by actual impropriety or the appearance of impropriety, in violation of 41 U.S.C. §§ 2101-2106 and 18 U.S.C. § 207, Federal Acquisition Regulation ("FAR") 3.101, and

---

[3] Mr. Murray went on terminal leave from the Army in August of 2011 and officially retired on November 1, 2011.  Pl. Mot. JAR Ex. 1 (Murray Dep. at 5).

FAR 3.104-2(b)(3); (2) MICC failed to conduct a responsibility inquiry pursuant to FAR 9.104 and FAR Subpart 9.4, or, in the alternative, should have known that HCS was not a responsible contractor and ineligible for this Contract award; (3) MICC failed to assess the possibility of an organizational conflict of interest ("OCI"), as required by FAR 9.504(c); and (4) MICC's inspection findings and subsequent evaluations of Command's proposed hotels were unreasonable and inconsistent with the Solicitation's stated evaluation criteria.  Compl. ¶¶ 36-39, 41-43, 45-48, and 50-53.

On July 24, 2012, Command also filed a Motion For A Preliminary Injunction, together with the Declarations of Brandon Anderson, Command's Chief Operating Officer; Brian Anderson, Command's Chief Marketing Officer; Carleton Penn, Command's Phoenix area Regional Manager; and Edward Schroeder, a Command employee.  On August 17, 2012, the Government and HCS filed Responses.  On August 24, 2012, Command filed a Reply.

On July 29, 2012, Command and the Government filed a Joint Motion For Protective Order.  On July 30, 2012, the court granted that motion.  On July 30, 2012, HCS filed an unopposed Motion To Intervene, pursuant to RCFC 24(a)(2).  On July 31, 2012, the court granted that motion.

On August 8, 2012, the parties filed a Joint Motion For Scheduling Order.  On August 9, 2012, the court granted that motion.  On August 17, 2012, the Government filed, under seal, a Consent Motion To Supplement The Administrative Record with the declaration of the CO, Terri Corbett ("Gov't Mot. To Suppl. AR").[4]  On August 17, 2012, Command filed, under seal, a

---

[4] Supplementation of the administrative record in bid protest actions in this court is governed by the United States Court of Appeals for the Federal Circuit's decision in *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009). "[S]upplementation of the [administrative] record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'"  *Id.* at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'"  *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735).  However, to perform an effective review pursuant to the APA, the court must have a record containing the information upon which the agency relied when it made its decision, as well as any documentation revealing the agency's decision-making process.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[S]ince the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence[,] it may be necessary for the [d]istrict [c]ourt to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard."), *abrogated in an unrelated respect by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *see also Montana Fish, Wildlife, & Parks Found., Inc. v. United States*, 91 Fed. Cl. 434, 440-41 (2010).

The court has determined that supplementation of the Administrative Record with the CO's declaration is necessary for effective review of whether the CO complied with FAR 9.504 and/or acted arbitrarily and capriciously.  *See Axiom*, 564 F.3d at 1380.  Therefore, the court

Motion To Supplement The Administrative Record ("Pl. Mot. To Suppl. AR"), with documents supporting Command's July 24, 2012 Complaint alleging an actual or apparent OCI and requesting that MICC "conduct a search of e-mail and telephone logs for any post-October 2011 communications between [Mr.] Lewis and [Mr.] Murray or HCS," and requested the court to "grant leave to Command to issue subpoenas to [Mr.] Murray and HCS seeking the production of all communications relating to the Solicitation between [Mr.] Murray, HCS[,] and [Mr.] Lewis," and also to "grant leave to Command to depose Mr. Murray and Mr. Lewis." Pl. Mot. To Suppl. AR at 6, 15. On August 24, 2012, the Government filed a Response In Opposition To Plaintiff's [August 17, 2012] Motion To Supplement The Administrative Record.

On August 24, 2012, the Government filed a Motion To Strike the declarations that Command attached to its July 24, 2012 Motion For Preliminary Injunction, with the exception of the May 14, 2012 declaration of Brian Anderson ("Gov't Mot. To Strike"). On September 10, 2012, Command filed a Response To the Government's Motion To Strike. On September 20, 2012, the Government filed a Reply.[5]

On October 16, 2012, the court held a status conference to discuss Command's August 17, 2012 Motion To Supplement The Administrative Record and the parties' proposed briefing schedule. On the same date, the court issued a Scheduling Order. On October 23, 2012, the court also issued an Order granting Command's August 17, 2012 Motion To Supplement The Administrative Record and allowing Command to take the depositions of First Sergeant Lewis and Mr. Murray.

On November 21, 2012, Command filed a Motion For Judgment On The Administrative Record ("Pl. Mot. JAR"). On December 5, 2012, the Government filed a Cross-Motion For Judgment On The Administrative Record And Response To Plaintiff's Motion For Judgment On The Administrative Record ("Gov't Mot. JAR").

---

grants the Government's August 17, 2012 Consent Motion To Supplement The Administrative Record with the CO's declaration.

[5] In this case, the court has determined that the declarations referenced in the Government's August 24, 2012 Motion To Strike are not necessary for effective judicial review, because they were prepared only in connection with the litigation and were not part of the record before MICC when it awarded the contract nor before the GAO in Command's May 14, 2012 protest. Although Command argues that the Declaration of Brandon Anderson evidences Mr. Murray's acquisition of non-public information during his 2009 visit to Command's Portland, Oregon headquarters, the declaration does nothing other than assert that Mr. Murray had access to broad categories of non-public information. Because the declaration fails to provide any facts supporting these assertions, the declaration is not necessary for effective judicial review of Command's claims.

The Government did not move to strike the May 14, 2012 Declaration of Brian Anderson, because it was part of the Administrative Record before the GAO. Gov't Mot. To Strike at 1 n.1 (citing AR Tab 50.1-.4 at 2513-24). For these reasons, the Government's August 24, 2012 Motion To Strike is granted.

On December 5, 2012, HCS also filed a Response To The Plaintiff's Motion For Judgment On The Administrative Record And Cross-Motion For Judgment On The Administrative Record ("D-Int. JAR Resp.").   On December 12, 2012, Command filed a Combined Opposition To Defendant And Intervenor Motions For Judgment On The Administrative Record And Reply In Support Of Plaintiff's Motion For Judgment ("Pl. Reply"). On December 19, 2012, the Government filed a Reply ("Gov't Reply").   On that date, HCS also filed a Reply ("D-Int. Reply").

## III.   DISCUSSION.

### A.   Jurisdiction.

Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id*.

In this case, the July 24, 2012 Complaint alleged several violations of law and/or FAR "in connection with" this procurement.  Compl. ¶¶ 35-58.  As such, the July 24, 2012 Complaint recites a sufficient basis for the court to exercise jurisdiction, pursuant to 28 U.S.C. § 1491(b)(1).

### B.   Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1).  *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue.").   The United States Court of Appeals for the Federal Circuit has construed the term "interested party" as synonymous with the definition of "interested party" as recited in the Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. § 3551(2)(A).  *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" to convey standing under 28 U.S.C. § 1491(b)(1)).  As such, the United States Court of Appeals for the Federal Circuit requires that a two-part test be applied in determining whether a protester is an "interested party"; a protestor must establish that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement."   *Distrib. Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).  In addition, in post-award protests, the plaintiff also must show it had a "substantial chance" of receiving the contract.  *See Rex Serv. Corp.*, 448 F.3d at 1307.

The second standing requirement is that the protestor must show that the alleged errors in the procurement were prejudicial.  *See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375,

1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal quotation marks omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). Prejudice is demonstrated where the protestor "can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378. Importantly, a proper standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error. *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

In this case, Command was an actual offeror, that timely submitted several alternative proposals in response to the Solicitation. Compl. ¶ 14. In addition, Command had a direct economic interest in the procurement because, if the allegations in its July 24, 2012 Complaint are taken as true, Command had a substantial chance of receiving the contract at issue. Therefore, the court has determined that Command was an interested party to the Solicitation and would be prejudiced by MICC's alleged errors regarding the alleged OCI, failure to investigate, and failure to disqualify HCS. If these allegations are established, Command had a substantial chance of receiving the contract award, since two of Command's seven proposals were deemed "acceptable" and eligible for contract award. Command asserts that HCS should have been disqualified from award as a non-responsible offeror, and in the alternative, that HCS benefitted from the fact that inspection standards were applied in an unreasonable and uneven manner. Compl. ¶¶ 42-43, 47, 51-52. Taken as true, these allegations support a finding that Command would have had a substantial chance of receiving the contract, but for the alleged errors. *See Labatt*, 577 F.3d at 1378.

For these reasons, the court has determined that Command has standing to contest the award of the contract at issue in this case.

## C.    The Applicable Standards Of Review.

Pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (1996), the United States Court of Federal Claims is required to review challenges to an agency decision, pursuant to the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) (2006) (The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"). The United States Court of Appeals for the Federal Circuit has provided the trial courts with specific guidance in how to analyze the required showings for injunctive relief under APA standards.

The United States Court of Appeals for the Federal Circuit has held that a bid award may be set aside if "the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). The United States Court of Appeals for the Federal Circuit has clarified, however, that when a contract award is challenged, based on regulatory or procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.*, 564 F.3d at 1381 (internal quotation marks omitted). This burden is even greater when the procurement is a "best value" procurement, as is the case here. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion . . . . [T]he relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted); *see also Unisys Corp. v. Widnall*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) ("In determining whether the agency has complied with the regulation authorizing best value procurements, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

If an award decision is challenged as arbitrary, capricious, or lacking a rational basis, the trial court "must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *Savantage Fin. Servs. v. United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) (internal alterations, quotation marks, and citations omitted); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis").

The court may set aside the procurement, but "only in extremely limited circumstances." *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evidences that the agency "considered the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke . . . highly deferential rational basis review. . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors." (internal quotation marks and citations omitted)).

## D.   Issues Raised By The Plaintiff's Motion For Judgment On The Administrative Record.

### 1.   Whether The Government Violated Federal Acquisition Regulation 1.102-2(c)(1), 3.101-1, 9.504, 9.505, And 9.506.

#### a.   The Plaintiff's Argument.

MICC, as the contracting agency, had a duty to protect the integrity of the procurement process and avoid "'engag[ing] in conduct that . . . favors one offeror over another.'" Pl. Reply

at 2 (citing FAR 1.102-2(c)(1)[6]; quoting FAR 15.306(e)).  Command argues, however, that the "procurement [was] tainted by an apparent or actual impropriety, conflict, unfair competitive advantage[,] or bias occasioned by the Murray/Lewis assistance to HCS," the presence of which requires "(a) a thorough inquiry by the [CO], followed by [(]b) appropriate ameliorative measures to ensure that HCS enjoys no unfair competitive advantage."  Pl. Mot. JAR at 28 (citing Compl. ¶¶ 31-35).

FAR 1.102-2(c)(1) and FAR 3.101-1[7] require disqualification of a procurement offeror where impropriety or the possibility of an unfair competitive advantage in the acquisition process is present.  Pl. Mot. JAR at 28-29 (citing FAR 1.102-2(c)(1); FAR 3.101-1; *see also NFK Eng'g v. United States*, 805 F.2d 372, 377 (Fed. Cir. 1986) (recognizing that the appearance of impropriety alone can be a sufficient basis to disqualify an offeror and finding that the agency reasonably decided to disqualify the offeror on that basis); *Telecommunication Sys. Inc.*, B-404496.3 (GAO Oct. 26, 2011) ("[W]here a firm may have gained an unfair competitive advantage through its hiring of a former government official, the firm can be disqualified from a competition based upon the appearance of impropriety which is created by this situation, even if no actual impropriety can be shown, so long as the determination of an unfair competitive advantage is based on facts and not on mere innuendo or suspicion.")).

In addition, FAR 9.504(a)[8] requires that contracting officials avoid, neutralize, or mitigate potential significant conflicts of interest to prevent an unfair competitive advantage or

---

[6] FAR 1.02-2(c)(1) provides

(1) An essential consideration in every aspect of the System is maintaining the public's trust.  Not only must the System have integrity, but the actions of each member of the Team must reflect integrity, fairness, and openness.  The foundation of integrity within the System is a competent, experienced, and well-trained, professional workforce.  Accordingly each member of the Team is responsible and accountable for the wise use of public resources as well as acting in a manner which maintains the public's trust.  Fairness and openness require open communication among team members, internal and external customers, and the public.

48 C.F.R. § 1.102-2(c)(1).

[7] FAR 3.101-1 provides, in pertinent part

Government business shall be conducted in a manner above reproach and . . . with complete impartiality and with preferential treatment for none. . . .  The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships.

48 C.F.R. § 3.101-1.

[8] FAR 9.504(a) provides, in pertinent part, that "contracting officers shall analyze planned acquisitions in order to . . . [i]dentify and evaluate potential organizational conflicts of

the existence of conflicting roles that may impair that official's objectivity.  When a possibility of an impropriety or unfair competitive advantage arises, it must be investigated by the contracting agency.  Pl. Reply at 3 (citing FAR 9.504(a)).  If the contracting agency's investigation confirms that there is a significant possibility of impropriety, conflict, or unfair competitive advantage, "the agency must fashion and implement reasonable ameliorative measures."  Pl. Reply at 3 (citing FAR 9.504-.506; *Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011) ("A significant potential conflict is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders.")).  These regulations were promulgated to prevent an unfair competitive advantage through unauthorized access to "proprietary" and "source selection information."  FAR 9.505(b).  But they also recognize that conflicts may arise in factual situations "not expressly covered" by FAR 9.505 or FAR 9.508.  In this case, the SSEB Instructions explicitly warned that "[i]t is imperative that all team members refrain from discussing this or any other type of information with anyone outside the evaluation team, the contracting advisor, and/or the [MEPCOM] individual who may be observing the evaluation process."  AR Tab 38 at 2162.  In addition, the Source Selection Plan instructed SSEB Chairman Lewis and other SSEB members to avoid even the "appearance" of a conflict (AR Tab 35 at 1860); "immediately" report any possible conflicts to the CO (AR Tab 35 at 1860); not discuss evaluation or source selection information with unauthorized persons, "even after the announcement of the successful contractor" (AR Tab 35 at 1868); conduct themselves "in a way that will not adversely affect the confidence of the public in the source selection process (AR Tab 35 at 1868); and "avoid any action, whether or not prohibited, that could result in or create the appearance of . . . losing independence or impartiality[.]"  AR Tab 35 at 1868.

The record establishes a "potential or actual conflict, unfair competitive advantage[,] or bias—namely, [that] Murray [and] Lewis [provided] assistance to [HCS]."  Pl. Mot. JAR at 33-34.  As the former SEA, Mr. Murray supervised Western sector MEPS contracts, served as the "point person" with MEPS contractors, and "received non-public Command information[.]"  Pl. Mot. JAR at 33.  In that capacity, he also was in contact with First Sergeant Lewis at Phoenix MEPS, who served as the SSEB Chairman for this procurement.  Pl. Mot. JAR at 34.  After joining HCS in September 2011, Mr. Murray "assisted HCS in its competition with Command under the Solicitation," and during the time Command's GAO protest was pending, Mr. Murray contacted SSEB Chairman Lewis, and the two called a Command employee, Mr. Schroeder, "in an attempt to solicit [him] to leave Command and join HCS."  Pl. Mot. JAR at 34.

Despite this situation, MICC did not investigate whether there was a conflict, unfair competitive advantage, or impropriety, as required by FAR 9.504, FAR 9.505, and FAR 9.506(b) in the face of even the "possibility of a conflict, unfair competitive advantage, or bias."  Pl. Mot. JAR at 35; Pl. Reply at 5.  This failure prevented MICC from taking the "second of two mandated steps—fashion[ing] and implement[ing] informed [ameliorative] measures that will ensure that the procurement is conduct[ed] without the risk of a conflict, unfair competitive advantage or bias."  Pl. Mot. JAR at 31, 35.  The court, therefore, should mandate these actions by MICC.  Pl. Mot. JAR at 35.

---

interest as early in the acquisition process as possible; and . . . [a]void, neutralize, or mitigate significant potential conflicts before contract award."  48 C.F.R. § 9.504(a).

**b.** **The Government's Response.**

The Government responds that there was no actual or potential conflict of interest or bias on the part of MICC.  Gov't Mot. JAR at 6.  The United States Court of Appeals for the Federal Circuit has explained that the FAR "requires mitigation of 'significant potential conflicts,' but does not require mitigation of other types of conflicts, such as apparent or potential non-significant conflicts," and that contracting officers are entitled to "considerable discretion" in identifying conflicts and developing mitigation plans where a significant potential conflict exists.  Gov't Mot. JAR at 7 (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1352-53 (Fed. Cir. 2010)).  A contracting officer is "only required to document the existence of an [OCI] and prepare a mitigation plan, upon determining that a potential conflict is in fact 'significant.'"  Gov't Mot. JAR at 7-8 (quoting *PAI Corp.*, 614 F.3d at 1353).  In addition, the United States Court of Appeals for the Federal Circuit also has suggested that an OCI exists only where a relationship between two parties creates an actual competitive advantage for one of them.  Gov't Mot. JAR at 8 (citing *Turner Constr. Co.*, 645 F.3d at 1384 (observing that one issue was whether the relationship between the conflicted parties created "a competitive advantage over the other bidders"); *see also id.* at 1388 (but determining the absence of an OCI where no facts existed showing that any of the allegedly conflicted parties "had access to any information of competitive worth")).

As a factual matter, Command is wrong in asserting that "Mr. Murray's prior position with the Army afforded him knowledge that amounted to unfair access to [non-public, competition-sensitive] information" that gave HCS a competitive advantage in putting together its proposal.  Gov't Mot. JAR at 8-9 (citing Pl. Mot. JAR at 5-6, 33).  The record shows only "unrelated and otherwise irrelevant facts" derived from Mr. Murray's deposition, such as his visits to MEPS Phoenix and his contacts with MEPS contractors and with personnel in the contracting office, including First Sergeant Lewis.  This evidence is "highly speculative and severely lacking in substance."  Gov't Mot. JAR at 9.

The record substantiates that Mr. Murray's principal job was "serving as the senior enlisted advisor to the commander (an officer) of his organization on a variety of issues including training, health, welfare, and morale of his organization," which in part included giving "advice to MEPS on the subjects of training, school visits by recruiters, and testing," but he was not directly responsible for MEPS activities in any of those areas.  Gov't Mot. JAR at 9-10 (citing Pl. Mot. JAR Ex. 1 (Murray Dep. at 6-7, 8-10)).  To the extent that Mr. Murray had any contact with MEPS contracting offices or first sergeants, these contacts were in the context of serving as a "go-between" for the contracting representatives/first-sergeants and contracting offices to address site-specific problems.  Gov't Mot. JAR at 11 (citing Pl. Mot. JAR Ex. 1 (Murray Dep. at 11-12, 18-19)).  In addition, Mr. Murray testified that he had no involvement in MEPS contracting and never saw an MEPS contract during his tenure with MEPCOM, nor did he have much activity related to the issue of contracting.  Gov't Mot. JAR at 11 (citing Pl. Mot. JAR Ex. 1 (Murray Dep. at 18-19, 23)).  Even if Mr. Murray did have supervisory responsibility over MEPS contracts, Command has failed to "explain how such alleged supervisory duties would have necessarily provided HCS with access to proprietary Command information, or even [to] what specific information such a position would have given him access[.]"  Gov't Reply at 4.

Command's argument that Mr. Murray received proprietary business information from his trip to Command's headquarters (Pl. Mot. JAR at 5-6) is similarly unsupported. Command's assertion is based solely on vague conclusions from the Declaration of Brandon Anderson (Command's Chief Operating Officer) attached to Command's July 24, 2012 Motion For A Preliminary Injunction and from Mr. Murray's Deposition testimony, in which he denied having discussed any proprietary information. Gov't Mot. JAR at 13-14. Mr. Anderson's declaration is problematic not only because of its vagueness, but also because it is based on little personal knowledge of either Mr. Murray's job responsibilities or MEPCOM's chain of command. Gov't Reply at 5-6. Instead, Command simply lists broad categories of information that it believes Mr. Murray obtained from Command, without providing any detail about the information he allegedly obtained. Gov't Reply at 5. As such, Command has not met its burden of providing hard facts to support its allegations. Gov't Mot. JAR at 13, 15.

In addition, there is no evidence that the Army showed bias in favor of Mr. Murray or HCS. It is true that Mr. Murray's first point of contact in the Phoenix MEPS office was First Sergeant Lewis. Gov't Mot. JAR at 15. But, First Sergeant Lewis testified that he only called Mr. Murray a total of three times, when Mr. Murray was in the Army, and the two had very limited contact when Mr. Murray visited the Phoenix MEPS office. Gov't Mot. JAR at 15-16 (citing Pl. Mot. JAR Ex. 1 (Lewis Dep. at 10:3-21, 15:2-16:22) (Nov. 8, 2012)). In addition, contrary to Command's assertions, Mr. Murray did not supervise First Sergeant Lewis. First sergeants at MEPS offices reported to their supervisors, not to Mr. Murray. Gov't Mot. JAR at 16-17.

The fact that First Sergeant Lewis assisted Mr. Murray in contacting and allegedly attempting to hire one of Command's employees on June 5, 2012 does not evidence bias. This action occurred when First Sergeant Lewis no longer was serving as Chairman of the SSEB, which had been dissolved. AR Tab 51 at 2525 (Mar. 9, 2012 Source Selection Decision). Instead, First Sergeant Lewis was acting in his capacity as a "contracting officer representative." Furthermore, it was appropriate for First Sergeant Lewis to work with Mr. Murray "to ensure that the MEPS lodging contract was performed properly, including working to ensure that the transition was handled smoothly," and to "assist with the hiring of personnel who were familiar with the contract." Gov't Mot. JAR at 17-18. In addition, the competition had concluded and the contract was awarded to HCS, and First Sergeant Lewis was not aware that a protest had been filed. Gov't Mot. JAR at 17 (citing Pl. Mot. JAR Ex. 1 (Lewis Dep. at 23:5-9)); Gov't Reply at 7. Therefore, Command's allegations of bias are unsupported by any evidence of actual wrongdoing or of a facilitating relationship. Gov't Mot. JAR at 16.

Last, "[n]othing in the record suggests that the contracting officer acted outside her 'considerable discretion' when, upon learning that Mr. Murray was employed by HCS, she did not determine his employment to be a 'significant potential conflict' that warranted a mitigation plan." Gov't Mot. JAR at 18 (quoting *PAI Corp.*, 614 F.3d at 1352-53). There is no reason why the CO should have identified Mr. Murray as a significant potential conflict, since he was cleared to work for Command or any other contractor after November 1, 2011. AR Tab 56 at 2622-23. Nor did the CO have any personal relationship with Mr. Murray or observe any improper interaction between Mr. Murray and any other SSEB members during on-site evaluations. Gov't

Mot. JAR at 18.   Likewise, the CO had no reason to believe that Mr. Murray had any information, proprietary or otherwise, or that he had any specific expertise about Phoenix area contracts, that would have afforded HCS a competitive advantage.   Gov't Mot. JAR at 18-19 (citing AR Tab 57 at 2625 (showing that Mr. Murray supervised the entire Western Sector)).

### c.        The Defendant-Intervenor's Response.

HCS adds that, the competition, evaluations, and source selections relating to the procurement all ended when the Army awarded the contract to HCS on April 30, 2012.   AR Tab 1 at 16; AR Tab 2 at 38.   The meeting between Mr. Murray, First Sergeant Lewis, and the Command employee allegedly being solicited did not occur until June 5, 2012, after the competition had ended and First Sergeant Lewis had become a "contracting officer's representative" for the Army, rather than a member and chairman of the SSEB.   D-Int. JAR Resp. at 2-3 (citing Pl. Mot. JAR Ex. 1 (Lewis Dep. at 28)).   First Sergeant Lewis facilitated this meeting "as part of his normal contract administration duties," and HCS asserts that it is "not unusual for a new contractor to fill some of its positions with persons from the unsuccessful former incumbent contractor's staff."   D-Int. JAR Resp. at 3 (citing Pl. Mot. JAR Ex. 1 (Lewis Dep. at 31)).   Command, however, mischaracterized First Sergeant Lewis as Chairman of the SSEB during that time and "improperly involved with a competitor's employee, [Mr.] Murray," in an attempt to "poach" a "competitor's employee," even after the competition ended.   D-Int. JAR Resp. at 4.   This misleading characterization caused the court to allow the Depositions of First Sergeant Lewis and Mr. Murray; therefore, "the [c]ourt should consider sanctions (costs of the Depositions) against the Plaintiff for its continuing misleading filings."   D-Int. JAR Resp. at 5-6.

The period of competition under the Solicitation began on December 11, 2011 and ended on April 30, 2012.   During that time, First Sergeant Lewis and Mr. Murray "had no written or telephonic contact of any kind as confirmed by the Government's document search . . . and based on the sworn Deposition testimony of Lewis and Murray[.]"   D-Int. JAR Resp. at 7.   The only brief face-to-face interaction occurred when First Sergeant Lewis was part of the "Army group that inspected the HCS hotel that HCS offered in response to the . . . Solicitation."   D-Int. JAR Resp. at 7.   Therefore, there was no inappropriate contact between Mr. Murray and First Sergeant Lewis.

With respect to Command's allegations regarding Mr. Murray's access to and use of Command's proprietary information, HCS responds that Mr. Murray testified in his November 8, 2012 Deposition that he remembered very little from the presentation given to him at Command's Portland, Oregon headquarters in 2009 and denied that he was presented with any proprietary information during his visit.   D-Int. JAR Resp. at 8.   This testimony is consistent with the fact that none of the Army group members at the 2009 presentation were required by Command to sign any type of non-disclosure agreement.   D-Int. JAR Resp. at 8.   In addition, Mr. Murray was not involved in any source selection activities or other activities relating to the MEPS contracts or proposals while with the Army, nor was he involved in the proposal process while at HCS, other than assisting HCS in selecting the location of a hotel.   D-Int. JAR Resp. at 8.   In addition, Mr. Murray sought and received a letter of guidance from a Designated Agency Ethics Official on September 8, 2011, prior to his retirement from active duty, that specifically

16

authorized him to accept a position with a contractor firm providing meals, lodging, and transportation to military applicants. D-Int. JAR Resp. at 8-9 (citing AR Tab 56 at 2622-24; AR Tab 57 at 2625-27; AR Tab 58 at 2628-29). Therefore, Command's allegations in this regard also lack merit.

After the court's conference call on September 13, 2012, the parties met, and on October 2, 2012, the Government requested, at the insistence of Command, that the CO conduct a "thorough OCI investigation of Murray concerning the same OCI allegations now before the [c]ourt." D-Int. Reply at 9-10. On November 7, 2012, the CO requested information from HCS in connection with her investigation. D-Int. Reply Ex. 2. In response, HCS provided the sworn declarations of Mr. Murray, in his capacity as a Project Manager for HCS, and Dick Williams, HCS's Executive Vice-President. D-Int. Reply at 10 (citing D-Int. Reply Ex. 3). On December 7, 2012, the CO issued a letter concluding that there is "insufficient evidence to substantiate a finding that an OCI exists." D-Int. Reply Ex. 4.[9] Now that an OCI investigation has been conducted and completed, HCS requests that the court dismiss Command's "primary allegation in this protest [(Compl. ¶¶ 9, 39, 47)] claiming that the Army failed to conduct an OCI investigation of [Mr.] Murray." D-Int. Reply at 11.

### d.      The Court's Resolution.

The issues presented in the first three claims of Command's Complaint are: (1) whether the CO failed to follow FAR provisions requiring that the CO investigate and avoid or mitigate an actual or apparent conflict of interest prior to contract award; and (2) whether Command has met its burden to establish that an actual or apparent conflict of interest, or bias, existed that caused Command to be prejudiced.

With respect to the CO's obligations under the FAR, the United States Court of Appeals for the Federal Circuit has explained that:

[FAR] Section 9.504(a) requires that a contracting officer "(1) [i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and (2) [a]void, neutralize, or mitigate *significant potential conflicts* before contract award." 48 C.F.R. § 9.504(a) (emphasis added). This regulation requires a contracting officer to identify and evaluate potential conflicts in the early stages of the acquisition process. Section . . .9.504(a) does not require that this preliminary analysis be documented in writing, but if a potential conflict is identified, the regulation specifies that the contracting officer must avoid, neutralize, or mitigate any "significant potential conflicts" before the contract award. *Id.* § 9.504(a). A significant potential conflict is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders. *See ARINC [Eng'g Servs. v. United States]*,

---

[9] HCS requests that the court supplement the Administrative Record with these four exhibits. D-Int. Reply at 10-11. The court denies this request, as this Opinion does not rely on these exhibits, nor are they necessary for "effective judicial review." *Axiom*, 564 F.3d at 1380.

77 Fed. Cl. [196,] 202 [(2007)].  Section 9.504(a) therefore requires mitigation of "significant potential conflicts," but does not require mitigation of other types of conflicts, such as apparent or potential non-significant conflicts.  The contracting officer does have considerable discretion in determining whether a conflict is significant.  Moreover, the FAR provides a contracting officer with considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts and to develop a mitigation plan in the event that a significant potential conflict exists.  48 C.F.R. § 9.505; *see also Axiom*, 564 F.3d at 1382.

*PAI Corp.*, 614 F.3d at 1352-53.

In sum, the FAR requires that "[e]ach individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract.  The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it."  *PAI Corp.*, 614 F.3d at 1352 (citing 48 C.F.R. § 9.505); *see also Axiom*, 564 F.3d at 1382 (citing *ARINC*, 77 Fed. Cl. at 202 ("The responsibility for determining whether such unequal access exists and what steps should be taken in response thereto rests squarely with the contracting officer.")).  Importantly, FAR 9.504(d) provides that "[t]he contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists."  48 C.F.R. § 9.504(d).  Moreover, under the FAR, a contracting officer is only required to document the existence of an OCI, and prepare a mitigation plan, upon determining that a potential conflict is "significant."  *PAI Corp.*, 614 F.3d at 1352.

In this case, there was no reason for the CO to suspect, before the issuance of the Solicitation or the filing of Command's bid protest, the potential existence of a "significant" OCI.  Nor did Command raise this as a potential issue to the CO prior to the award or the initial GAO protest.  Gov't Mot. To Suppl. AR (CO Corbett Decl. ¶ 10).  Mr. Murray sought and received clearance to work for a private contractor following his retirement from active duty and was prohibited from representing a contractor before the MEPCOM until his terminal leave period ended on November 1, 2011.  AR Tab 56 at 2622 (Sept. 8, 2011 Department of Defense's Deputy Command Legal Counsel's opinion that Mr. Murray was not prohibited by the Procurement Integrity Act, 41 U.S.C. § 2104, from accepting compensation from a contractor after his retirement from active service); AR Tab 57 at 2625 (Sept. 29, 2011 Meals and Lodging Ethics Advisory noting that Mr. Murray was not ethically precluded from "accepting post-retirement employment with HCS"); AR Tab 58 at 2628 (Department of Defense's Deputy Command Legal Counsel's Sept. 8, 2011 e-mail to Mr. Murray that there was "no conflict of interest" with him taking a position with Command or any other "hotel broker," but that he was prohibited from "engag[ing] in duties requiring any significant direct contact with [MEPCOM] . . . contracting personnel until [November 1, 2011]").  In September, 2011, the CO for the procurement was informed by MEPCOM's Meals and Lodging Program Manager of Mr. Murray's plans to work for HCS and that he had been cleared to work for one of the meals and lodging contractors.  Gov't Mot. To Suppl. AR (CO Corbett Decl. ¶ 2).  Based on this information, and on limited personal knowledge of Mr. Murray, the CO concluded that Mr. Murray's employment with HCS did not present a conflict of interest, significant potential

conflict of interest, or potential ethics violation, and did not investigate the matter further.  Gov't Mot. To Suppl. AR (CO Corbett Decl. ¶ 3-4).

Mr. Murray's only apparent contact with members of the SSEB during the period of competition prior to award occurred at the SSEB's inspection of HCS's proposed hotel, on February 27 or 28, 2012, but after his terminal leave ended.  AR Tab 2 at 37; *see also* Pl. Mot. JAR Ex. 1 (Lewis Dep. at 10:3-21, 15:2-16:22) (First Sergeant Lewis's testimony that he did not have more than a few interactions with Mr. Murray over a three year period including the competition under the Solicitation).[10]  Furthermore, Mr. Murray's June 5, 2012 phone call to a Command employee, facilitated by First Sergeant Lewis, occurred after Mr. Murray's terminal leave had ended, and the competition was over.  Mr. Murray also was not involved in the selection process in his capacity as an SEA, or in the preparation of HCS's proposal in response to the Solicitation, in any way, other than in selecting the location of a hotel for the proposal.  Pl. Mot. JAR Ex. 1 (Murray Dep. at 52).

Command had the burden of identifying "hard facts" to support its allegations of a conflict of interest or bias on the part of MICC that gave HCS unequal access to information or an unfair competitive advantage in obtaining the contract award.  The court has determined that Command failed to meet this burden.  *See PAI Corp.*, 614 F.3d at 1352 ("To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough."); *see also C.A.C.I., Inc.- Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (holding that to demonstrate that a contract award is arbitrary or capricious on the basis of a "possibility and appearance of impropriety," a protester must identify "hard facts," not a mere inference based on "suspicion or innuendo").

The Administrative Record does not set forth any facts evidencing that Mr. Murray obtained any proprietary information about Command during his visit to its Portland, Oregon headquarters in 2009.  Nor does the Administrative Record show that Mr. Murray used any proprietary information, if he received any.  Although Command refers to four categories of non-public information that it asserts Mr. Murray obtained during his visit to Command's Portland headquarters, Command did not identify "hard facts" demonstrating that he acquired any such information.  With regard to this visit, Mr. Murray testified that he was not presented with any proprietary information, nor was he or any of the other Army representatives asked by Command to sign a non-disclosure agreement.  As such, Command has not provided any "hard facts" to establish an actual or apparent conflict of interest.

In addition, the interactions between Mr. Murray and First Sergeant Lewis with respect to "recruiting" calls made to a Command employee on June 5, 2012 do not evidence the existence of bias or a potential conflict of interest, since this event took place after the contract was awarded and after First Sergeant Lewis's duties on the SSEB ended.  First Sergeant Lewis's

---

[10]  In addition, the CO's declaration provided that she did not "witness any inappropriate behavior or overhear any inappropriate conversations between any SSEB member and an offeror's representative" at any of the on-site evaluations.  Gov't Mot. To Suppl. AR (CO Corbett Decl. ¶ 6-7).

conduct, however, appears to conflict with his responsibility to MICC in contract administration and should be further examined. AR Tab 35 at 1868 (Source Selection Participation Agreement requiring SSEB team members to certify that they will not "discuss evaluation or source selection matters . . . even after the announcement of the successful contractor" and that they will "avoid any action, whether or not prohibited, that could result in or create the appearance of my losing independence or impartiality"); AR Tab 38 at 2162 (SSEB Team Instructions barring SSEB members from "discussing [information about the evaluation process] or any other type of information").[11]

### 2. Whether MICC's Inspection Findings Concerning Command's And HCS's Proposals Were Unreasonable.

#### a. The Plaintiff's Argument.

Next, Command argues that MICC failed to apply the same inspection standards to both Command properties and the HCS property and that the debriefing record evidences "numerous instances of demonstrably erroneous or unreasonable" inspection findings by MICC. Pl. Mot. JAR at 36. Specifically, Command contends that MICC's findings regarding such "well-respected Phoenix landmarks," as the Crowne Plaza Phoenix and Renaissance Phoenix Downtown as "unacceptable," were "objectively erroneous or unreasonable and therefore fail to comport with the Solicitation evaluation criteria." Pl. Mot. JAR at 36-37. In support, Command provides a chart in which it counters many of MICC's inspection findings regarding weaknesses or deficiencies of Command's proposed hotels. Pl. Mot. JAR at 17-24. Command reasons that these erroneous or unreasonable findings, coupled with the absence of similar assessments of weaknesses in HCS's proposal, demonstrate that MICC failed to apply the same inspection standards to both bidders' proposed sites, and overlooked actual and readily apparent defects in HCS's proposed hotel. Pl. Mot. JAR at 24 (citing AR Tab 50.1-.4 (5/14/12 Anderson Decl.)). Therefore, Command requests that the court require that MICC conduct a new inspection, evaluation, and a new best value determination. Pl. Mot. JAR at 37.

#### b. The Government's Response.

With respect to the five Command proposals that were evaluated as "unacceptable," the Government responds that each properly was assigned one or more "deficiency" ratings, for failing to provide information or documents required by the Solicitation. Gov't Mot. JAR at 27 (citing AR Tab 51). In three proposals, Command failed to provide adequate surveillance system information, such as the number of cameras and the major points of surveillance, as required by paragraph 1.2.1 of the Solicitation. Gov't Mot. JAR at 27-28 (citing AR Tab 3 at 56; AR Tab at 566 (Holiday Inn & Suites Airport North proposal[12]); AR Tab at 729 (Holiday Inn Phoenix West

---

[11] It is unclear to what extent Mr. Lewis was bound by these Instructions after he was no longer a member of the SSEB.

[12] Command's proposal involving Holiday Inn & Suites Airport North also was assigned a deficiency, because it "failed to provide a lodging facility with interior corridor guest room entry," as required by paragraph 5.1.2.4 of the Solicitation (AR Tab 3 at 104). Gov't Mot. JAR at 30 (citing AR Tab 51 at 2531). Command did not dispute this deficiency. HCS, on the other

proposal); AR Tab at 1163 (Courtyard Scottsdale Old Town proposal)).   In addition, as Command admits, the Renaissance Phoenix Downtown proposal did not have a surveillance system, a fact that the hotel's management confirmed during the on-site evaluation. Gov't Mot. JAR at 29 (citing Pl. Mot. JAR at 22-23; AR Tab 51 at 2537).   Command's proposal did not propose to install a surveillance system that would comply with the Solicitation.  Gov't Mot. JAR at 29.  Therefore, the SSEB reasonably concluded that these proposals were incomplete and assigned each a deficiency.  On the other hand, HCS's proposal complied with the Solicitation's security requirements, providing the required number of cameras, their locations within the hotel, and the standard recording time. Gov't Mot. JAR at 29 (citing AR Tab 23 at 446).

In addition, Command's Crowne Plaza Phoenix Airport proposal failed to provide the current state health inspection report for the proposed food preparation/dining facility, as required by paragraph 1.17(a) of the Solicitation (AR Tab 3 at 56). Gov't Mot. JAR at 30 (citing AR Tab 51 at 2540).  Instead, Command provided a health inspection report for a similarly named coffee bar, not the restaurant, and the SSEB assigned a "deficiency" to this proposal.  AR Tab 51 at 2540.  Command admitted this error, but nevertheless argued that the SSEB "did not entertain oral presentations or accept proposal revisions during the on-site evaluation."  Gov't Mot. JAR at 30.  In contrast, HCS's proposal submitted current state health and inspection reports for its proposed food preparation and dining facilities.  Gov't Mot. JAR at 30.

With regard to the weaknesses and significant weaknesses assigned to Command's proposals, the Government contends that MICC's assessments were reasonable and logically-based.  Gov't Reply at 11.  As to "significant weaknesses," including the SSEB's finding that Command's Holiday Inn Phoenix West proposal did not demonstrate a clear understanding of the Solicitation's meals requirement, Command "failed to identify any determining factor utilized by the Agency's evaluators that was inconsistent with the stated criteria in the [S]olicitation."  Gov't Mot. JAR at 32.  Instead, Command "has merely stated a disagreement with the results of the evaluations.  Such disagreement does not meet the burden that the evaluation was unreasonable."   Gov't Mot. JAR at 32 (citing *Afghan Am. Army Serv. Corp. v. United States*, 90 Fed. Cl. 341, 364 (2009)).

In addition, the "weaknesses" in Command's proposals were supported by the Consensus Evaluation and SSEB Report.  AR Tab 51.  The Declaration of Brian Anderson, on which Command relies to contest these findings, discusses his personal observations disagreeing with the SSEB's findings, such as the uncleanliness of the bathrooms at Crowne Plaza Phoenix Airport (AR Tab 50.1 at 2513 (5/14/12 Anderson Decl. ¶ 2)), but does not "disprove the [contrary] observations of the SSEB team[.]"  Gov't Mot. JAR at 32 (citing AR Tab 51 at 2539-40).  Command's disagreement with the SSEB and MICC's evaluation of its proposals, however, does not properly establish that the agency's evaluation was unreasonable.  Gov't Mot. JAR at 33.

With respect to the SSEB's assessment of a "weakness," based on findings that three of Command's hotels were located in high traffic areas, the Government argues that the SSEB

---

hand, proposed a hotel "in which all guest rooms are accessed through an interior corridor." Gov't Mot. JAR at 31 (citing AR Tab 13 at 178).

appropriately employed personal knowledge and local understanding.  Gov't Reply at 11-12. With respect to the SSEB's assessment of a "weakness," because food preparers at two of Command's hotels did not wear gloves, the Government responds that this finding was inherently, logically, and reasonably related to the Solicitation's evaluation criteria, since sanitation and cleanliness were components of Evaluation Factor 1 - Mission Capability.  Gov't Reply at 12 (citing AR Tab 3 at 60-61 (Evaluation Rating Definitions/Descriptions)).  With respect to the SSEB's assessment of a "weakness," to one of Command's hotels, because an emergency exit staircase had low railings, "avail[ing] itself to a safety risk," the rating was consistent with the Solicitation.  Gov't Reply at 13 (citing AR Tab 2 at 42).

In addition, even if Command's proposals were re-evaluated and its ratings improved, "it has provided no allegations, facts, or law to show it would be next in line for award."  Gov't Mot. JAR at 37.  Command submitted only one proposal with a lower price than HCS's proposal, "and that proposal was deemed 'Unacceptable' in its Mission Capability Factor as the SSEB noted its proposal as having not one, but two deficiencies."  Gov't Mot. JAR at 37 (citing AR Tab 51 at 2526-27).  On the other hand, HCS received an "Outstanding" Mission Capability rating with the lowest price of any proposals deemed eligible for award.  Gov't Mot. JAR at 37.  In sum, only two of Command's proposals were deemed acceptable, but each had numerous weaknesses and both were more expensive than HCS's proposal.  Gov't Reply at 10 (citing AR Tab 39 at 2168-2180).  Therefore, Command failed to demonstrate that it has a substantial chance of award, but for MICC's alleged evaluation errors.

### c.    The Plaintiff's Reply.

Command replies that with respect to several of MICC's ratings downgrading Command's properties, the Government merely contends that MICC's hypothesizing regarding, *e.g.*, commute times longer than thirty minutes, or that MICC has "great discretion," are ample justifications for MICC's findings.  Pl. Reply at 10 (citing Gov't Mot. JAR at 34).  With respect to MICC's finding that the Crowne Plaza Phoenix emergency exit stairwells "provide a risk of injury as an applicant could fall or jump over the rail and go several flights down," AR Tab 20 at 208, Command points out that HCS's property had the same types of stairwells, as evidenced by the photograph contained within the declaration of Brian Anderson.  Pl. Reply at 11.  The Government's other responses to the challenged deficiencies are improper attempts to rely on unstated evaluation criteria to downgrade a proposal, which is forbidden as a matter of law.  Pl. Reply at 10-11 (citing *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 43 (2009)).

Furthermore, contrary to the Government's argument, governing precedent requires that Command need only show that there was a "substantial chance it would have received the contract award, but for that error."  Pl. Reply at 9 (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

### d.    The Court's Resolution.

To prevail in a bid protest, "the complainant must establish by a preponderance of the evidence that [the] defendant's actions either lacked a reasonable basis or violated applicable statutes and regulations." *Afghan Am. Army Serv. Corp*, 90 Fed. Cl. at 354 (citing *Banknote*

*Corp.*, 365 F.3d at 1351).  Where the court "finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."  *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989).  There is a "zone of acceptable results in each particular case," and the agency's decision must "be the result of a process that considers the relevant factors and is within the bounds of reasoned decision making."  *Afghan Am. Army Serv. Corp*, 90 Fed. Cl. at 355.

The United States Court of Appeals for the Federal Circuit has held that a proposal that fails to conform to a solicitation's material terms and conditions is technically unacceptable and ineligible for contract award.  *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) ("In negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.") (internal citations omitted).  In this case, the court has determined that the SSEB properly assigned "deficiency" ratings to five out of Command's seven proposals, because they failed to comply with explicit requirements of the Solicitation with respect to security requirements and health and inspection reports and therefore were incomplete.  AR Tab 3 at 55-56; AR Tab 39 (SSEB Initial Report); AR Tab 51 (Source Selection Decision).  The Solicitation clearly defined a "deficiency" as a "material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level."  AR Tab 3 at 60.  The Solicitation also defined an "Unacceptable" proposal as one that "does not meet requirements and contains one or more deficiencies."  AR Tab 3 at 60.  Three of Command's proposals failed to provide information required by the Solicitation with respect to details of each hotel's security surveillance system, and one proposal's hotel lacked a surveillance system altogether.  AR Tab 51 at 2531, 2533, 2536-37.  Another of Command's proposals lacked a current state health inspection report for the proposed food preparation and dining facility.  AR Tab 51 at 2540.  Therefore, based on the SSEB's determination that these five proposals failed to comply with explicit terms of the Solicitation, it was reasonable for the SSEB to assign deficiencies to these proposals, and for the CO to conclude that these proposals were ineligible for contract award.  Moreover, nothing in the record supports finding that the SSEB and the CO's conclusions in this regard were arbitrary or capricious.

With respect to Command's two eligible proposals, the court has determined that the SSEB's assessments of weaknesses and significant weaknesses with regard to the two hotel properties offered were reasonable.  Although Command challenges many of the SSEB's specific inspection findings (Pl. Mot. JAR at 17-24), the majority of these challenges reflect little more than a disagreement with the SSEB's on-site evaluations.  Mere disagreements with an agency's judgment concerning the adequacy of an offeror's proposal, as a matter of law, do not "establish that the agency acted unreasonably."  *Afghan Am. Army Serv. Corp*, 90 Fed. Cl. at 364 (quoting *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003)).

With respect to Command's claims that the SSEB's inspection standards were inconsistently applied, the court has determined that Command has failed to meet the burden of proof required to make such a showing.  As the United States Court of Appeals for the Federal

Circuit has stated, "contracting officers have a great deal of discretion in making contract award decisions, particularly when . . . the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote Corp.*, 365 F.3d at 1355; *see also E.W. Bliss Co.*, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value to the government.") (citations omitted). Many of the weaknesses assessed to its proposals, such as Command's failure to clearly specify where breakfast would be served in one of the hotels, or the existence of a safety risk with respect to emergency exit stairwells, were not at issue in HCS's proposal. *See, e.g.*, AR Tab 2 at 42 (Contracting Officer's Statement, noting that she did "not recall a similar emergency exit stairwell at any other hotel evaluated, to include the awardee's facility"). Any evidence in the record concerning similar weaknesses in HCS's hotel property, including photographs of worn carpeting or furniture, without more, does not demonstrate that the SSEB was biased or applied different standards to HCS's hotel.

Finally, Command has not asserted that HCS should have been charged with a deficiency, since HCS's proposal complied with the Solicitation's requirements in all material respects. The fact that HCS's proposal was less expensive than any of Command's proposals not assigned a deficiency, and therefore eligible for award, further demonstrates that Command was not prejudiced by the SSEB's evaluation of weaknesses and significant weaknesses in its offered hotels. In sum, HCS's proposal was eligible for award, less expensive, and was technically equal to or more highly rated than each of Command's eligible proposals. Even if HCS's proposal suffered from some of the same weaknesses as Command's, as Command now alleges, or if the Mission Capability ratings of Command's two eligible proposals were upgraded, giving Command an overall rating of "Outstanding," both of Command's eligible proposals were more expensive than HCS's proposal. As such, Command has not established that, but for these ratings, it would have had a substantial chance at award. As such, Command was not prejudiced by the SSEB's or the CO's conclusions regarding its proposals and the award of a contract to HCS.

## IV.    CONCLUSION.

For the foregoing reasons, the Government's December 5, 2012 Cross-Motion For Judgment On The Administrative Record is granted and Command's November 21, 2012 Motion For Judgment On The Administrative Record is denied.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**